**Saundra C. CARNEY, Appellant,**

v.

**MARTIN LUTHER HOME, INC., Appellee.**

No. 86–1798.

United States Court of Appeals, Eighth Circuit.

Submitted March 11, 1987.

Decided July 27, 1987.

Rehearing and Rehearing En Banc Denied Aug. 27, 1987.

* The HONORABLE EARL R. LARSON, Senior District Court Judge for the District of Minnesota, sitting by designation.

Carole McMahon-Boies, Lincoln, Neb., for appellant.

Mary C. Wickenkamp, Lincoln, Neb., for appellee.

Before ARNOLD and FAGG, Circuit Judges, and LARSON,* Senior District Judge.

LARSON, Senior District Judge.

Plaintiff Saundra Carney appeals from the district court's decision in favor of her employer, defendant Martin Luther Home, Inc. Plaintiff argues that the defendant violated Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–2, when it placed her on an unpaid leave during her pregnancy at a time when she remained able to perform her job. We agree that the employer's action in this case constitutes a Title VII violation, and, accordingly, we reverse the decision of the district court and remand with instructions that judgment be entered in favor of Carney.

Defendant Martin Luther Home operates an intermediate care facility for mentally retarded persons in Beatrice, Nebraska. Plaintiff had been employed by the Home since 1982. When she became pregnant in the fall of 1983, she held a split position of houseparent/adult services trainer. On weekdays, she began her duties as adult services trainer at 1:00 p.m. in the workshop area of the Home.[1] As an adult ser-

1. Carney worked from 1:00 p.m. to 9:00 p.m. Monday through Thursday and from 2:00 p.m. to 10:00 p.m. on Sunday. For purposes of this appeal, we refer simply to the testimony relating

vices trainer, she worked in the PreVoc I section of the workshop, helping to teach a range of skills such as how to place objects in boxes, how to sort colors and how to put together items for sale to the public. Different groups of approximately five or six to twenty residents participated in the Pre-Voc I workshop programs. Besides the actual training activities, workshop staff were involved in escorting residents from the workshop area to other areas of the Home, which occasionally involved pushing a resident in a wheelchair. During the hours Carney worked in the workshop, there were approximately six or seven other staff in the PreVoc I section, as well as other staff in other areas of the workshop.

At 4:00 Carney assumed her duties as houseparent at the Maple Hall dormitory. Residents at the Home were generally grouped in the dormitories by age, sex and functioning level. Carney was houseparent to six to eight adolescent girls who were able to perform most day-to-day functions such as dressing, eating, walking and basic hygiene. These girls did not generally become aggressive either towards each other or towards the staff, although one experienced seizures and another occasionally displayed a "behavior" of falling to the floor. Carney went with the girls to supper, helped them bathe and brush their teeth, took them to evening recreational activities and helped them get ready for bed. One girl, who had recently had surgery, was for a time confined to a wheelchair and required more assistance than the other girls in performing these activities. At least two houseparents and frequently additional physical education staff were present at Maple Hall during the time Carney was with the girls.

Carney performed all of her duties while pregnant without any difficulty for the four and one half months prior to the time she was placed on medical leave by the Home. Her supervisors viewed her as a very good employee and never had any problems with the performance of her duties. In February, 1984, Carney went to see her physician's assistant, William Plymale, and reported that she had been experiencing some lightheadedness and dizziness. Plaintiff discussed the nature of her job with Plymale, who did not believe she should stop working, but who did recommend that for the duration of her pregnancy she should refrain from pushing or lifting without assistance. Plymale testified that this recommendation was no different from that which he would give to any pregnant individual.[2] At plaintiff's request, Plymale made a note of his recommendation on a prescription pad, which Carney presented to her workshop supervisor, Susan Adams.[3] Adams indicated that plaintiff should not worry about it, since she could arrange for other staff to escort any residents in wheelchairs that needed to be pushed from the workshop to other areas of the Home.

Later in the day, plaintiff was called to a meeting with Eileen Simmons, the personnel director at Martin Luther Home. Simmons informed the plaintiff that because of the note, Carney would have to take an unpaid leave of absence and that after her baby was born Carney could be reconsidered for employment. Plaintiff returned to her job and worked the remainder of her shift that day without altering her tasks or responsibilities. Simmons then spoke with other officials at the Home, including Ken Wellensiek, Residential Coordinator, and Marge Cedarburg, Director of Programs. She did not, however, consult with either of Carney's two immediate supervisors to find out whether the restrictions plaintiff's doctor had placed on her activities would inter-

to her weekday schedule, since it is relevant only that her duties included both those of houseparent and those of adult services trainer.

**2.** Plaintiff's physician, Dr. Koenig, also testified that he had previously examined plaintiff and had never recommended that she stop working, although he had recommended in connection with her military reserve service that she not perform any "inordinate lifting." Koenig testi-

fied that he saw no reason why Carney could not lift a 70 pound resident such as she cared for at Martin Luther Home with assistance.

**3.** Plaintiff testified that employees were instructed to show the Home "any type of note that has anything to do with your health whatsoever."

fere with plaintiff's performance of her job. When Carney submitted a supplemental letter from Plymale to Simmons, Simmons reaffirmed that Carney would be placed on unpaid medical leave and that her job would be posted. Plaintiff received no salary from the Home until after the birth of her child when she was reemployed in a position at Linden Hall.

The district court found that at the time plaintiff was placed on unpaid leave, she could have performed her duties without difficulty. This finding is amply supported by the evidence and is not challenged by the Home on appeal. Plaintiff testified that she in fact would not have altered the performance of her job as a result of Plymale's recommendations, and it is undisputed that the Home's policy *required* employees to obtain assistance in lifting any resident. Moreover, plaintiff presented evidence that other employees with similar restrictions had continued to work at the Home and had performed their jobs successfully. For example, Cynthia Lillibridge, who was also an adult services trainer/houseparent at Maple Hall, testified that she became pregnant in 1982 and received instructions from her physician not to perform any heavy lifting. A letter from her physician was presented to her supervisors, and Lillibridge continued to perform her duties until she took maternity leave, after which she returned to her same position. Cynthia Scheideler, a houseparent at Cedar Hall, a geriatric dormitory at the Home, also became pregnant during her employment and was advised by her doctor not to perform any heavy lifting. Scheideler presented a note from her physician to this effect and testified that her pregnancy in no way affected her ability to do the work she was assigned. After a six week maternity leave, Scheideler returned to her same position at the Home. Finally, Anna Hogan, an on-call houseparent and physical education recreation staff member assigned to Maple Hall, testified that after she became pregnant in 1983, she was involved in an automobile accident and was advised by her doctor to restrict her pushing and lifting. Hogan, like Lillibridge and Scheideler, informed her supervisor of the restrictions and continued to perform her duties as before.

Although recognizing that plaintiff was placed on leave at a time when she was fully able to perform her job, the district court nonetheless concluded that the Home did not discriminate against Carney. The court analyzed plaintiff's claim under the disparate treatment test of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and concluded that plaintiff had failed to show that defendant's articulated reason for its actions—the "concern as to liability should the plaintiff become injured, or should a client become injured ... combined with concern over whether the plaintiff could carry out her job responsibilities"—was pretextual. Plaintiff challenges the district court's analysis, claiming that she submitted direct evidence of discrimination under Title VII and that the defendant failed to establish that such discrimination was justified as a bona fide occupational qualification (BFOQ).

It is undisputed that plaintiff was placed on leave as a result of a medical condition arising from her pregnancy and that, despite this condition, she could have performed her job successfully. The issue in this appeal is to what extent Title VII protects pregnant women in such circumstances.

## I. The Pregnancy Discrimination Act Amendment to Title VII

Title VII declares it unlawful for an employer to discharge or otherwise discriminate against any individual with respect to compensation, terms, conditions or privileges of employment because of such individual's sex. 42 U.S.C. § 2000e-2. In 1978, Congress enacted the Pregnancy Discrimination Act (PDA), which declares that discrimination on the basis of "pregnancy, childbirth, or related medical conditions" constitutes sex discrimination under Title VII. The Act amended Title VII's definitional section as follows:

The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work. . . .

42 U.S.C. § 2000e(k).

The immediate impetus for the PDA arose from the Supreme Court's decision in *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), in which the Court held that the exclusion of pregnancy-related disabilities from an employee disability plan did not discriminate on the basis of sex and therefore did not violate Title VII. *Id.* at 136–37, 97 S.Ct. at 408. The Act's language and legislative history indicate the amendment was designed specifically to overrule the *Gilbert* decision, and to require employers who provided disability benefits to their employees to extend such benefits to women who are unable to work due to pregnancy-related conditions. *See California Federal Savings & Loan Ass'n v. Guerra*, — U.S. —, 107 S.Ct. 683, 691, 93 L.Ed.2d 613 (1987); *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 678–79, 103 S.Ct. 2622, 2628–29, 77 L.Ed.2d 89 (1983).[4] Opposition to the Act came primarily from employers concerned about increased costs, *Guerra*, 107 S.Ct. at 692 & n. 21, and Congress sought to limit the burden on employers by making clear that the amendment was intended only to prevent the *exclusion* of pregnancy coverage, not to require that employers who had no disability or medical benefits at all provide

them to pregnant women. H.R.Rep. No. 95–948, 95th Cong., 2d Sess. 5, 6 (1978), *reprinted in* Legislative History of the Pregnancy Discrimination Act of 1978, 96th Cong., 2d Sess. 151, 152 (1979) ("Legislative History"); S.Rep. No. 95–331, 95th Cong., 1st Sess. 4–5 (1977), *reprinted in* Legislative History at 41–42, U.S.Code Cong. & Admin.News 1978, p. 4749.

The PDA was enacted for a second and broader purpose as well, namely, to prevent the differential treatment of women in all aspects of employment based on the condition of pregnancy. *See, e.g.*, H.R.Rep. No. 95–948 at 6–7, *reprinted in* Legislative History at 152–153; S.Rep. No. 95–331 at 6, *reprinted in* Legislative History at 43. The Senate Report explains: "A failure to address discrimination based on pregnancy, in fringe benefits or in any other employment practice, would prevent the elimination of sex discrimination in employment." S.Rep. No. 95–331 at 3, *reprinted in* Legislative History at 40. This report continues:

This bill is intended to make plain that, under Title VII of the Civil Rights Act of 1964, discrimination based on pregnancy, childbirth, and related medical conditions is discrimination based on sex. . . .

. . . Under this bill, the treatment of pregnant women in covered employment must focus not on their condition alone but on the actual effects of that condition on their ability to work. Pregnant women who are able to work must be permitted to work on the same conditions as other employees; and when they are not able to work for medical reasons, they must be accorded the same rights, leave privileges and other benefits, as other workers who are disabled from working.

*Id.* at 3–4, *reprinted in* Legislative History at 40–41. The report notes that "perhaps

4. Both the House and the Senate Reports cite with favor the dissenting Justices' views in *Gilbert*, in particular that "it offends common sense to suggest . . . that a classification revolving around pregnancy is not, at the minimum, strongly 'sex-related'" and that "[b]y definition, such a rule discriminates on account of sex; for it is the capacity to become pregnant which primarily differentiates the female from the male." H.R.Rep. No. 95–948, 95th Cong., 2d

Sess. 2 (1978), *reprinted in* Legislative History of the Pregnancy Discrimination Act of 1978, 96th Cong., 2d Sess. 148 (1979); S.Rep. No. 95–331, 95th Cong., 1st Sess. 2–3 (1977), *reprinted in* Legislative History at 39–40, U.S.Code Cong. & Admin.News 1978, p. 4750. *See General Electric Co. v. Gilbert*, 429 U.S. at 149, 97 S.Ct. at 414 (Brennan, J., dissenting), *id.* at 161–62, 97 S.Ct. at 420–21 (Stevens, J., dissenting).

the most important effect" of the PDA is to prohibit employer policies which forced women who became pregnant to stop working regardless of their ability to continue, which set arbitrary time limits within which they must return to work, and which accorded no seniority to women who returned to work from a leave for pregnancy-related reasons. *Id.* at 6, *reprinted in* Legislative History at 43.

The history and effect of such policies were addressed in statements by House and Senate members as well as in testimony before the Committees considering the legislation. *See, e.g.,* Legislative History at 2–3, 61–63, 123 Cong.Rec. 29,385 (1977) (Sen. Williams); Legislative History at 129–130 (Sen. Cranston); *id.* at 25–26, 166–167 (Rep. Hawkins); Legislation to Prohibit Sex Discrimination on the Basis of Pregnancy: Hearing on H.R. 5055 and H.R. 6075 Before the Subcommittee on Employment Opportunities of the House Committee on Education and Labor, 95th Cong., 1st Sess. 5–17, 43–45, 64 (1977) (statements of Wendy Williams and Lawrence Gold); Discrimination on the Basis of Pregnancy, 1977: Hearings on S. 995 Before the Subcommittee on Labor of the Senate Committee on Human Resources, 95th Cong., 1st Sess. 113–115, 122–135, 208, 232–233, 450 (1977) (statements of Wendy Williams, Lawrence Gold, David Fitzmaurice and Letty Cottin Pogrebin). These statements emphasized the change in the American workforce to include a large percentage of women and the economic hardship faced by these women and their families when discrimination on the basis of pregnancy and related medical conditions occurs. *See, e.g.,* S.Rep. No. 95–331 at 9, *repreinted, in* Legislative History at 46; Legislative History at 61–63 (Sen. Williams); *id.* at 170 (Rep. Sarasin); *id.* at 172 (Rep. Green); *id.* at 185–186 (Rep. Burke). By enacting the PDA, Congress rejected the outdated notions upon which many "protective" laws and policies were based, policies which often resulted "from attitudes about pregnancy and the role of women who become pregnant which are inconsistent with the full participation of women in our economic system," and which perpetuated women's second class status in the workplace. Legislative History at 61–62 (Sen. Williams). As the Supreme Court has stated, "[t]he reports, debates and hearings make abundantly clear that Congress intended the PDA to provide relief for working women and to end discrimination against pregnant workers." *Guerra,* 107 S.Ct. at 692.

## II. Application of the PDA

In this case, the district court found the defendant did not discriminate against the plaintiff when it placed her on unpaid medical leave despite her ability to work. The court applied the disparate treatment analysis of *McDonnell Douglas* and *Burdine,* finding that plaintiff established a prima facie case and that defendant articulated legitimate non-discriminatory reasons for its actions—a concern for potential liability should Carney or a resident become injured and a concern, albeit not well-founded, for her ability to perform her job. The court concluded that plaintiff had not proven that these reasons were pretextual because plaintiff's situation was not exactly identical to those of other employees who had medical restrictions but were not placed on leave, she failed to show any animus on the part of the defendant toward pregnant women, and the defendant's failure to investigate whether plaintiff could actually perform her job, while "an unfortunate and perhaps even an arbitrary omission," did not make its actions discriminatory. The Home adopts the district court's reasoning on appeal and argues that because its decision was based on Carney's medical condition, not on her pregnancy *per se,* its actions do not fall within the ambit of Title VII. We reject this contention.

The first clause of the PDA, 42 U.S.C. § 2000e(k), defines sex discrimination as discrimination on the basis of "pregnancy, childbirth, or related medical conditions." The House Report explains this language as follows:

In using the broad phrase "women affected by pregnancy, childbirth and related medical conditions," the bill makes clear that its protection extends to the

whole range of matters concerning the child-bearing process.

H.R.Rep. No. 95–948 at 5, *reprinted in* Legislative History at 151, U.S.Code Cong. & Admin.News 1978, p. 4753. The Supreme Court has held that the meaning of this clause is not restricted by the specific language in the second clause,[5] which the Court found was intended specifically to overrule the *Gilbert* decision and to illustrate how discrimination is to be remedied. *Guerra*, 107 S.Ct. at 691; *Newport News*, 462 U.S. at 678 n. 14, 103 S.Ct. at 2628 n. 14. Senator Williams, who sponsored the PDA in the Senate, shared this view:

> This legislation will prohibit not only discrimination in the provision of disability benefits, which was the type of discrimination which occurred in the Gilbert case, but it will also prohibit discrimination on the basis of pregnancy *or conditions arising out of pregnancy* for all employment-related purposes.

Legislative History at 62 (emphasis added). Indeed, throughout the legislative history, the effect of the Act is described as the plain meaning of its language would dictate; to clarify that sex discrimination under Title VII includes discrimination on the basis of pregnancy, childbirth, or medical conditions arising therefrom. *See, e.g.,* H.R.Rep. No. 95–948 at 1, *reprinted in* Legislative History at 147; S.Rep. No. 95–331 at 1, *reprinted in* Legislative History at 38; Legislative History at 129 (Sen. Cranston); *id.* at 167 (Rep. Hawkins). Commentators have agreed that "[b]y broadly defining pregnancy discrimination, Congress clearly intended to extend protection beyond the simple fact of an employee's pregnancy" to include "related medical conditions" such as nausea or potential miscarriage. S. Wald, *Judicial Construction of the 1978 Pregnancy Discrimination Amendment to Title VII: Ignoring Congressional Intent*, 31 Am.U.L.Rev. 591, 611 (1982).

■ Thus, we agree with the plaintiff that she presented direct evidence of discrimination by establishing that the defendant placed her on unpaid medical leave as a result of a "related medical condition," and we find that the district court erred in applying the *McDonnell Douglas* test under these circumstances. *See TWA, Inc. v. Thurston,* 469 U.S. 111, 121–22, 105 S.Ct. 613, 622, 83 L.Ed.2d 523 (1985). Our reading of the statute is consistent with the EEOC Guidelines which state:

> A written or unwritten employment policy or practice which excludes from employment applicants or employees because of pregnancy, childbirth or related medical conditions is in prima facie violation of Title VII.

29 C.F.R. § 1604.10(a). The Home admits its decision was based on the condition that plaintiff not lift or push without assistance, a condition directly arising from her pregnancy.

The inquiry does not end here, however, as the defendant has the opportunity to show that its considerations amount to a bona fide occupational qualification under 42 U.S.C. § 2000e–2(e). *See, e.g., TWA, Inc. v. Thurston,* 469 U.S. at 122, 105 S.Ct. at 622; *Dothard v. Rawlinson,* 433 U.S. 321, 332–34, 97 S.Ct. 2720, 2728–29, 53 L.Ed.2d 786 (1977); *Harriss v. Pan American World Airways, Inc.,* 649 F.2d 670, 676 (9th Cir.1980); *Diaz v. Pan American World Airways, Inc.,* 442 F.2d 385, 386 (5th Cir.), *cert. denied,* 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971). *See also* 1 A. Larson & L. Larson, *Employment Discrimination: Sex* § 12.11 at 3–22 (1985); S. Wald, *supra,* 31 Am.U.L.Rev. at 610–11.

---

**5.** The second clause states:

> and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work....

42 U.S.C. § 2000e(k). The Home did not attempt to show that its treatment of Carney was "the same" as its treatment of other individuals with similar restrictions. In fact, the evidence of past practice with respect to pregnant individuals is to the contrary, and the Home objected to the admission of evidence concerning its treatment of an individual with non-pregnancy related restrictions.

In *Harriss v. Pan American World Airways, Inc.*, for example, Pan Am established that its mandatory maternity leave policy for female flight attendants was reasonably necessary to the essence of its business, namely, passenger safety. 649 F.2d at 676–77. In addition to establishing that the job requirements in question were "reasonably necessary" to the essence of the employer's business, the *Harriss* Court determined that the employer also

> has the burden of proving that he had reasonable cause to believe, that is, a factual basis for believing, that all or substantially all women [in the same position as the plaintiff] would be unable to perform safely and efficiently the duties of the job involved.

*Id.* at 676 (citing *Weeks v. Southern Bell Telephone & Telegraph Co.*, 408 F.2d 228, 235 (5th Cir.1969)). Where safety is concerned, the courts have held that "[t]he greater the safety factor, measured by the likelihood of harm and the probable severity of that harm in case of an accident, the more stringent may be the job qualifications." *Id.; Levin v. Delta Air Lines, Inc.*, 730 F.2d 994, 997 (5th Cir.1984). In each case, an objective analysis of plaintiff's actual physical capabilities and the employer's job requirements is necessary, *Levin v. Delta Air Lines, Inc.*, 730 F.2d at 998–99; an employer's good faith or subjective beliefs will not save an otherwise discriminatory decision. *See EEOC v. Old Dominion Security Corp.*, 41 F.E.P. Cases 612, 617–18 (E.D.Va.1986).

In this case, the Home failed to carry its burden of establishing a BFOQ defense, and in fact has conceded on appeal that the plaintiff could perform her job without difficulty. While we have no doubt that the Home harbors no ill motive against plaintiff or other pregnant women, history reveals that women have consistently been denied equal opportunities based on a professed concern for their well-being and/or unfounded notions about their capabilities. *See Muller v. Oregon*, 208 U.S. 412, 421–22, 28 S.Ct. 324, 326–27, 52 L.Ed. 551 (1908); *Cleveland Board of Education v. LeFleur*, 414 U.S. 632, 641 n. 9, 94 S.Ct. 791, 797 n. 9, 39 L.Ed.2d 52 (1974); *General Electric Co. v. Gilbert*, 429 U.S. at 149 n. 1, 97 S.Ct. at 415 n. 1 (Brennan, J., dissenting). The PDA was enacted to ensure that pregnant women are judged on their actual ability and willingness to work, and although the Home had no mandatory leave policy, its decision as to the plaintiff in effect forced her from the workplace at a time when she was willing and able to perform her job successfully. Had the officials who made the decision to place plaintiff on leave simply consulted with plaintiff's immediate supervisors, they would have discovered that her pregnancy in no way interfered with her job performance.

Under these circumstances, we believe the district court erred in concluding that the Home did not violate Title VII, and, accordingly, we reverse the judgment of the district court and remand with instructions that judgment be entered in favor of plaintiff Carney.