Crystal CHAMBERS, in her own Behalf
and in behalf of her minor daughter,
Ruth Chambers, Appellants,

v.

The OMAHA GIRLS CLUB, INC., a Ne-
braska Corporation; Mary Heng-
Braun, Director; Mrs. Harold W. An-
dersen, and 80 other members of the
Board of Directors, both individually
and in their official capacities; the
Omaha World Herald, a Nebraska Cor-
poration; Harold W. Andersen, Presi-
dent; John Gottschalk, Vice President;
Woodson Howe, Vice President, both
individually and in their official capaci-
ties; the Nebraska Equal Opportunity
Commission; Lawrence Myers, Execu-
tive Director; Daniel Wherry, Chair-
man; Carmen Gottschalk, Commission-
er; Rose Marie Brandt, Commissioner;
Peggy Schmidt, Commissioner; Fran-
ces Dunson, Commissioner; Patricia
Dorwart, Commissioner; Susan Gorrea,
Commissioner; Paul Douglas, former
Attorney General of Nebraska; Charles
Thone, former Governor of Nebraska,
all both individually and in their offi-
cial capacities; Allan Lozier; Clarence
Barbee; N.P. Dodge, Jr.; Dennis R.
Woods; Dana Bradford, III; Richard
Kizer; Kermit Brashear, II; Eileen
Wirth, members of the Board; Bobbie
Kerrigan, Deputy Director, and the ac-
tive members of the Girls Club Board,
Appellees.

No. 86–1447.

United States Court of Appeals,
Eighth Circuit.

Submitted March 9, 1987.

Decided Dec. 3, 1987.

Rehearing Denied Feb. 25, 1988.

Rehearing En Banc Denied Feb. 25, 1988.*

---

* Editor's note: An opinion dissenting from the denial of rehearing en banc will be published.

Mary Kay Green, Omaha, Neb., for appellant.

Robert D. Mullin, Omaha, Neb., for Omaha Girl's Club.

Sharon Lindgren, Asst. Atty. Gen., Lincoln, Neb. for other appellees.

Before McMILLIAN, BOWMAN, and WOLLMAN, Circuit Judges.

WOLLMAN, Circuit Judge.

Crystal Chambers appeals the district court's orders and judgment disposing of her civil rights, Title VII employment discrimination, and pendent state law claims. Chambers' claims arise from her dismissal as an employee at the Omaha Girls Club on account of her being single and pregnant in violation of the Club's "role model rule." The primary issue in this appeal is whether the Club's role model rule is an employment practice that is consistent with Title VII because it is justifiable as a business necessity or a bona fide occupational qualification.

**I**

The Omaha Girls Club is a private, nonprofit corporation that offers programs designed to assist young girls between the ages of eight and eighteen to maximize their life opportunities.[1] Among the Club's many activities are programs directed at pregnancy prevention. The Club serves 1,500 members, ninety percent of them black, at its North Omaha facility and 500 members, fifty to sixty percent of them black, at its South Omaha facility. A substantial number of youngsters who are not Club members also participate in its programs. The Club employs thirty to thirty-five persons at its two facilities; all of the

---

1. The Club's objectives are to:

   1. Create a safe and stable environment that fosters trusting relationships and individual value development through interaction with peers and adults.

   2. Develop and implement programs to enable girls to build positive self esteem through skill development and application.

   3. Make available quality health programs so girls may understand and deal with their own health problems and health maintenance.

   4. Establish a climate where girls participate in and experience the decision making process and have broad opportunity to take leadership roles.

   5. Provide opportunities for girls to explore the full range of their personal options in family roles and career choices in order to take control of their lives.

   6. Encourage a knowledge and understanding of the various cultures in our society. Promote a broad view of responsibility as a citizen of a larger community through education and civic activity.

   7. Encourage both individual and group responsibility.

   Record at 30.

non-administrative personnel at the North Omaha facility are black, and fifty to sixty percent of the personnel at the South Omaha facility are black.

The Club's approach to fulfilling its mission emphasizes the development of close contacts and the building of relationships between the girls and the Club's staff members. Toward this end, staff members are trained and expected to act as role models for the girls, with the intent that the girls will seek to emulate their behavior. The Club formulated its "role model rule" banning single parent pregnancies among its staff members in pursuit of this role model approach.[2]

Chambers, a black single woman, was employed by the Club as an arts and crafts instructor at the Club's North Omaha facility. She became pregnant and informed her supervisor of that fact. Subsequently, she received a letter notifying her that because of her pregnancy her employment was to be terminated. Shortly after her termination, Chambers filed charges with the Nebraska Equal Opportunity Commission (NEOC) alleging discrimination on the basis of sex and marital status. The NEOC found no reasonable cause to believe that unlawful employment discrimination had occurred. Chambers[3] then brought this action in the district court seeking injunctions and damages.[4]

Chambers ultimately alleged, after a series of amendments to her complaint, that her rights under the first, fifth, ninth, and fourteenth amendments had been violated. She asserted civil rights claims under 42 U.S.C. §§ 1981, 1983, 1985, 1986, and 1988, and state law claims for bad faith discharge, defamation, invasion of privacy, intentional infliction of emotional distress, intimidation, and conspiracy to deprive her of her livelihood. She also alleged violations of Title VII. Chambers named as defendants numerous organizations and individuals associated with those organizations: the Club, its director, deputy director, and board of directors; the *Omaha World Herald* newspaper and three of its officers; the NEOC, its executive director, and its commissioners; Charles Thone, the Governor of Nebraska; and Paul Douglas, the Attorney General of Nebraska.[5]

On October 19, 1983, the district court[6] issued an order dismissing Chambers' sec-

2. The Club's personnel policies state the rule as follows:

   MAJOR CLUB RULES

   All persons employed by the Girls Club of Omaha are subject to the rules and regulations as established by the Board of Directors. The following are not permitted and such acts may result in immediate discharge:

   * * * * * *

   11. Negative role modeling for Girls Club Members to include such things as single parent pregnancies.

   Record at 28.

3. As the case caption indicates, Chambers also brought this action on behalf of her daughter Ruth, the child born of the pregnancy that brought about this litigation. The district court dismissed Ruth Chambers for lack of standing. Chambers challenges the district court's conclusion on the standing issue in this appeal. *See infra* at 704–705.

4. Chambers brought this action during the pendency of her appeal to the Equal Employment Opportunity Commission's (EEOC's) District Office. The EEOC later found reasonable cause to believe that Chambers' charge of employment discrimination was true, but did not enter into a conciliation agreement with or bring a civil action against the Club. Chambers amended her complaint to add the employment discrimination claims under Title VII after receiving a right-to-sue letter from the EEOC pursuant to 42 U.S.C. § 2000e–5(f)(1) (1982).

5. Several of the defendants were named as parties to this case primarily on the basis of Chambers' allegations that they were involved in a conspiracy to deprive her of her rights in violation of section 1985(3), section 1986, and state law. Although Chambers appeals the various determinations of the district court rejecting her conspiracy claims, *see infra* at 15–16, we find it unnecessary for the purposes of this opinion to recount in detail the alleged facts in support of these claims. Stated generally, Chambers alleged that the spouses of different *Omaha World Herald* officers were members of the NEOC and the Club's board of directors, that they caused the proceedings before the NEOC to be prejudiced and caused an editorial supporting the role model rule to be published in the *Omaha World Herald,* and that public officials knew of or aided the alleged conspiratorial activities.

6. The Honorable Warren K. Urbom, United States District Judge for the District of Nebraska. On December 31, 1984, Judge Urbom granted Chambers' motion for his recusal. All orders entered after that date and referred to in this

tion 1983 claim against the Club,[7] finding the NEOC absolutely immune from liability under section 1983, dismissing Governor Thone and Attorney General Douglas for failure to state a claim against them, and dismissing all of the state law claims except the conspiracy and intimidation claims. On November 7, 1985, the district court entered an order granting the motion of the *Omaha World Herald* for summary judgment on the section 1985(3) and state conspiracy claims against it. On January 6, 1986, the matter went to trial. The claims remaining against the Club at the time of trial included: (1) conspiracy to deprive Chambers of her rights in violation of 42 U.S.C. § 1985(3), (2) conspiracy in violation of state law, (3) intentional race discrimination in violation of 42 U.S.C. § 1981, and (4) a combination of race and sex discrimination in the course of employment in violation of 42 U.S.C. § 2000e–2(a).[8] At the close of the plaintiff's case the court directed a verdict in favor of the Club on the section 1985(3), section 1981, and state conspiracy claims. The court explained its grounds for directing the verdict and announced its judgment

in favor of the Club on the Title VII claims in its order of February 11, 1986. *Chambers v. Omaha Girls Club*, 629 F.Supp. 925 (D.Neb.1986).

## II

We turn first to the district court's determination of the Title VII questions. The district court examined Chambers' allegations of employment discrimination[9] in violation of 42 U.S.C. § 2000e–2(a) under both the disparate impact and disparate treatment theories.[10] We review in turn the court's conclusions and Chambers' arguments under each of these theories.

## A

■ A plaintiff seeking to prove discrimination under the disparate impact theory must show that a facially neutral employment practice has a significant adverse impact on members of a protected minority group. The burden then shifts to the employer to show that the practice has a manifest relationship to the employment in question and is justifiable on the ground of

---

opinion were issued by The Honorable C. Arlen Beam, Chief Judge, United States District Court for the District of Nebraska.

7. Hereinafter we refer to the Club defendants collectively as the "Club." Similarly, we will refer to the other groups of defendants as the *"Omaha World Herald"* and the "NEOC."

8. Chambers voluntarily dismissed her claim under the free exercise clause of the first amendment. The district court did not consider Chambers' other constitutional claims. Chambers challenges the district court's failure to do so in this appeal. *See infra* at 704–705. The district court also dismissed Chambers' state claim for intimidation.

9. Neither party challenges the district court's description of Chambers' Title VII claim as based on a "combination of race and sex discrimination." *Chambers*, 629 F.Supp. at 944. The court also noted that it was concerned with race discrimination "only insofar as [the role model rule] may have an impact upon the class of black women." *Id.*

10. 42 U.S.C. § 2000e–2(a) (1982) provides:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

A separate provision makes it clear that Title VII prohibits discrimination on the basis of pregnancy. 42 U.S.C. § 2000e(k) (1982) provides in part:

For purposes of this subchapter—

\*   \*   \*   \*   \*

(k) The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work \*  \*  \*.

business necessity. Even if the employer shows that the discriminatory employment practice is justified by business necessity, the plaintiff may prevail by showing that other practices would accomplish the employer's objectives without the attendant discriminatory effects.[11] The district court found that "because of the significantly higher fertility rate among black females, the rule banning single pregnancies would impact black women more harshly." *Chambers*, 629 F.Supp. at 949.[12] Thus, Chambers established the disparate impact of the role model rule.[13] The Club then sought to justify the rule as a business necessity.

Establishing a business necessity defense presents an employer with a "heavy burden." *Hawkins v. Anheuser-Busch, Inc.*, 697 F.2d 810, 815 (8th Cir.1983). Business necessity exists only if the challenged employment practice has " ' "a manifest relationship to the employment in question." ' " *Id.* (quoting *Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2725, 53 L.Ed.2d 786 (1977) (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971))). The employer must demonstrate that there is a " 'compelling need * * * to maintain that practice,' " and the practice cannot be justified by " 'routine business considerations.' " *Id.* (quoting *Kirby v. Colony Furniture Co.*, 613 F.2d 696, 706 n. 6 (8th Cir.1980)); *see also EEOC v. Rath Packing Co.*, 787 F.2d 318, 331 (8th Cir.),

cert. denied, —— U.S. ——, 107 S.Ct. 307, 93 L.Ed.2d 282 (1986). Moreover, the employer may be required to show that the challenged employment practice is " 'necessary to safe and efficient job performance,' " *McCosh v. City of Grand Forks*, 628 F.2d 1058, 1062 (8th Cir.1980) (quoting *Dothard*, 433 U.S. at 332 n. 14, 97 S.Ct. at 2728 n. 14); *see also Rath Packing Co.*, 787 F.2d at 328; *Donnell v. General Motors Corp.*, 576 F.2d 1292, 1299 (8th Cir. 1978), or that the employer's goals are "significantly served by" the practice. *New York City Transit Auth. v. Beazer*, 440 U.S. 568, 587 n. 31, 99 S.Ct. 1355, 1366 n. 31, 59 L.Ed.2d 587 (1979). *See generally Nolting v. Yellow Freight Sys., Inc.*, 799 F.2d 1192, 1199 (8th Cir.1986).

The district court found that the role model rule is justified by business necessity because there is a manifest relationship between the Club's fundamental purpose and the rule. Specifically, the court found:

> The Girls Club has established by the evidence that its only purpose is to serve young girls between the ages of eight and eighteen and to provide these women with exposure to the greatest number of available positive options in life. The Girls Club has established that teenage pregnancy is contrary to this purpose and philosophy. The Girls Club established that it honestly believed that to permit single pregnant staff members to work with the girls would convey the

---

11. *See, e.g., Connecticut v. Teal*, 457 U.S. 440, 446–47, 102 S.Ct. 2525, 2530, 73 L.Ed.2d 130 (1982); *Dothard v. Rawlinson*, 433 U.S. 321, 328–29, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977); *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975); *Griggs v. Duke Power Co.*, 401 U.S. 424, 430–32, 91 S.Ct. 849, 853–54, 28 L.Ed.2d 158 (1971); *McIntosh v. Weinberger*, 810 F.2d 1411, 1426–27 (8th Cir. 1987); *Easley v. Anheuser–Busch, Inc.*, 758 F.2d 251, 255 n. 7 (8th Cir.1985); *Hawkins v. Anheuser–Busch, Inc.*, 697 F.2d 810, 815 (8th Cir.1983); *Kirby v. Colony Furn. Co.*, 613 F.2d 696, 703 (8th Cir.1980).

12. The court relied on statistics showing that black women generally, and black women within certain age groups in Douglas County, Ne-

braska, specifically, are more likely to become pregnant than white women. *Chambers*, 629 F.Supp. at 949 n. 45.

13. The district court found that Chambers had established disparate impact under the first method articulated by this court in *Green v. Missouri Pac. R.R.*, 523 F.2d 1290, 1293–94 (8th Cir.1975). *Chambers*, 629 F.Supp. at 948–49. The Club argues in its brief that the court erred in finding disparate impact. We are unpersuaded by the Club's argument and, furthermore, we are disinclined to devote further attention to the issue because of the Club's failure to assert a cross-appeal seeking reversal of the district court's finding of disparate impact. *See Wycoff v. Menke*, 773 F.2d 983, 985 (8th Cir.1985) (cross-appeal necessary to modify or alter lower court decision), *cert. denied*, 475 U.S. 1028, 106 S.Ct. 1230, 89 L.Ed.2d 339 (1986).

impression that the Girls Club condoned pregnancy for the girls in the age group it serves. The testimony of board members * * * made clear that the policy was not based upon a morality standard, but rather, on a belief that teenage pregnancies severely limit the available opportunities for teenage girls. The Girls Club also established that the policy was just one prong of a comprehensive attack on the problem of teenage pregnancy. The Court is satisfied that a manifest relationship exists between the Girls Club's fundamental purpose and its single pregnancy policy.

*Chambers*, 629 F.Supp. at 950. The court also relied in part on expert testimony to the effect that the role model rule could be helpful in preventing teenage pregnancy.[14] Chambers argues, however, that the district court erred in finding business necessity because the role model rule is based only on speculation by the Club and has not been validated by any studies showing that it prevents pregnancy among the Club's members.

Business necessity determinations in disparate impact cases are reviewed under the clearly erroneous standard of review applied to factual findings. Fed.R.Civ.P. 52(a); *see Hawkins*, 697 F.2d at 815; *see also Reddemann v. Minnesota Higher Educ. Coordinating Bd.*, 811 F.2d 1208, 1209 (8th Cir.1987) (per curiam). Thus, we may reverse the district court's finding of business necessity only if we are " 'left with the definite and firm conviction that a mistake has been committed.' " *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948)).

■ We believe that "the district court's account of the evidence is plausible in light of the record viewed in its entirety." *Id.* 470 U.S. at 573–74, 105 S.Ct. at 1511–12. Therefore, we cannot say that the district court's finding of business necessity is clearly erroneous. The district court's conclusion on the evidence is not an impermissible one. Although validation studies can be helpful in evaluating such questions, they are not required to maintain a successful business necessity defense. *Hawkins*, 697 F.2d at 815–16; *see Davis v. City of Dallas*, 777 F.2d 205, 217–18 (5th Cir.1985), *cert. denied*, 476 U.S. 1116, 106 S.Ct. 1972, 90 L.Ed.2d 656 (1986). Indeed, we are uncertain whether the role model rule by its nature is suited to validation by an empirical study.[15] Consequently, the court's conclusion in *Hawkins* is apt in this case: "We cannot say * * * that validation studies are always required and we are not willing to hold under the facts of this case that such evidence was required here." *Id.* at 816.

■ Chambers argues further, however, that the district court erred in discounting alternative practices that the Club could have used to ameliorate the discriminatory effects of the role model rule. Chambers contends that the Club either could have granted her a leave of absence or transferred her to a position that did not involve contact with the Club's members. The

---

**14.** Chambers' expert witness testified that the only way to resolve the teenage pregnancy problem was through economic opportunities such as education and jobs. The Club's expert agreed that these factors were important, but also testified concerning the value of role modeling and concluded that the role model rule "could be (and in her opinion is) another viable way to attack the problem of teenage pregnancy." *Chambers*, 629 F.Supp. at 951.

In addition to relying on the evidence concerning the Club's purpose and approach and the expert testimony, the district court found that the rule was adopted in response to two incidents involving Club members' reactions to the pregnancies of single Club staff members. *Id.* at 945.

**15.** Ironically, at oral argument Chambers' counsel responded in the negative to the court's question concerning whether the rule could ever be empirically proven to prevent pregnancy among the Club's members. Counsel's response must be construed to mean either that it is impossible to perform a meaningful empirical study of such matters, or that counsel believes that no such study would ever show the rule to have the effect desired by the Club. If we were to adopt the first construction it would be ludicrous for us to reverse for lack of validation studies. Moreover, the second construction presents nothing more than counsel's own belief concerning the role model rule, a belief rejected by the district court in favor of that held by the Club.

Club responds that neither of these alternatives was available in this case. The Club has a history of granting leaves of up to six weeks, but the purposes of the role model rule would have required a five to six month leave for Chambers, given that the pregnancy would have become visually apparent probably within three or four months. Moreover, employing a temporary replacement to take Chamber's position would itself have required six months of on-the-job training before the replacement would have been able to interact with the girls on the level that the Club's approach requires. The use of temporary replacements would also disrupt the atmosphere of stability that the Club attempts to provide and would be inconsistent with the relationship-building and interpersonal interaction entailed in the Club's role model approach. Furthermore, transfer to a "noncontact position" apparently was impossible because there are no positions at the Club that do not involve contact with Club members. The district court found that the Club considered these alternatives and determined them to be unworkable. *Chambers,* 629 F.Supp. at 945–46. We are unable to conclude that the district court's finding that there were no satisfactory alternatives to the dismissal of Chambers pursuant to the role model rule is clearly erroneous. Accordingly, we hold that the district court's finding that the role model rule is justified by business necessity and thus does not violate Title VII under the disparate impact theory is not clearly erroneous.

**B**

Unlike the disparate impact theory, the disparate treatment theory requires a plaintiff seeking to prove employment discrimination to show discriminatory animus. The plaintiff must first establish a prima facie case of discrimination. The burden of production then shifts to the employer to show a legitimate, nondiscriminatory reason for the challenged employment practice. If the employer makes such a showing, then the plaintiff may show that the reasons given by the employer were pretextual.[16] No violation of Title VII exists, however, if the employer can show that the challenged employment practice is a bona fide occupational qualification (bfoq).[17]

The district court found that Chambers had succeeded in establishing a prima facie case of discrimination but concluded that the Club's role model approach is a legitimate, nondiscriminatory reason for the role model rule. *Chambers,* 629 F.Supp. at 947. The court then found that Chambers was unable to show that the Club's reason for the rule was a pretext for intentional discrimination. *Id.* at 947–48. The court also stated in passing that the role model rule "presumably" is a bfoq. *Id.* at 941 n. 51.

Chambers argues alternatively that the district court erred in failing to find a violation of Title VII under the disparate treatment theory, and that this case should not be analyzed under the disparate treatment theory because Chambers' discharge on account of her pregnancy constitutes intentional discrimination without further analysis. Chambers also argues that the role model rule cannot be justified as a bfoq. Because we are persuaded that the role model rule qualifies as a bfoq, we find it

**16.** *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973); *see, e.g., Johnson v. Legal Servs. of Ark., Inc.,* 813 F.2d 893, 896 (8th Cir.1987); *Netterville v. Missouri,* 800 F.2d 798, 802–03 (8th Cir.1986); *Easley v. Anheuser-Busch, Inc.,* 758 F.2d 251, 256 n. 10 (8th Cir. 1985).

**17.** The bfoq exception, unlike the business necessity defense, is statutorily based. 42 U.S.C. § 2000e–2(e) (1982) provides in part:

Notwithstanding any other provision of this subchapter, (1) it shall not be an unlawful employment practice for an employer to hire and employ employees, * * * on the basis of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise * * *.

unnecessary to address Chambers' other arguments.[18]

The bfoq exception is " 'an extremely narrow exception to the general prohibition of discrimination on the basis of sex.' " *Gunther v. Iowa State Men's Reformatory,* 612 F.2d 1079, 1085 (8th Cir.), *cert. denied,* 446 U.S. 966, 100 S.Ct. 2942, 64 L.Ed.2d 825 (1980), (quoting *Dothard v. Rawlinson,* 433 U.S. 321, 334, 97 S.Ct. 2720, 2729, 53 L.Ed.2d 786 (1977)). In *Dothard v. Rawlinson,* 433 U.S. at 321, 97 S.Ct. at 2720, the Supreme Court found that a rule that prohibited employment of women in contact positions in all-male Alabama prisons was a bfoq under the particular circumstances of that case, which involved a prison system rife with violence. The statutory language, *see supra* note 17, is, of course, the best guide to the content of the bfoq exception; however, the courts, including the Supreme Court in *Dothard,* have noted the existence of several formulations for evaluating whether an employment practice is a bfoq. The formulations include: whether " 'the *essence* of the business operation would be undermined' " without the challenged employment practice, *Dothard,* 433 U.S. at 333, 97 S.Ct. at 2728 (quoting *Diaz v. Pan American World Airways, Inc.,* 442 F.2d 385, 388 (5th Cir.), *cert. denied,* 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971)) (emphasis in original); whether safe and efficient performance of the job would be possible without the challenged employment practice, *id.* (citing *Weeks v. Southern Bell Tel. & Tel. Co.,* 408 F.2d 228, 235 (5th Cir.1969)); and whether the challenged employment practice has " 'a manifest relationship to the employment in question.' " *Gunther,* 612 F.2d at 1086 (quoting *Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971)).

■ Although the district court did not clearly conclude that the role model rule qualified as a bfoq, several of the court's other findings are persuasive on this issue. The court's findings of fact, many of which are relevant to the analysis of a potential bfoq exception, are binding on this court unless clearly erroneous. The facts relevant to establishing a bfoq are the same as those found by the district court in the course of its business necessity analysis. As already noted, *see supra* at 701–02, the district court found that the role model rule has a manifest relationship to the Club's fundamental purpose and that there were no workable alternatives to the rule. Moreover, the district court's finding of business necessity itself is persuasive as to the existence of a bfoq. This court has noted that the analysis of a bfoq "is similar to and overlaps with the judicially created 'business necessity' test." *Gunther,* 612 F.2d at 1086 n. 8. The various standards for establishing business necessity are quite similar to those for determining a bfoq. Indeed, this court has on different occasions applied the same standard— "manifest relationship" —to both business necessity and bfoq. *Compare Hawkins v. Anheuser–Busch, Inc.,* 697 F.2d 810, 815 (8th Cir.1983) (business necessity) *with Gunther v. Iowa State Men's Reformatory,* 612 F.2d 1079, 1086 (8th Cir.), *cert. denied,* 446 U.S. 966, 100 S.Ct. 2942, 64 L.Ed.2d 825 (1980) (bfoq).[19] Inasmuch as we already have affirmed the district court's finding of business necessity as not clearly erroneous, *see supra* at 703, we feel compelled to conclude that "[i]n the particular factual circumstances of this

---

**18.** Even if the district court erred in finding no discrimination under the disparate treatment theory, our conclusion that the role model rule is a bfoq means that there can be no violation of Title VII. Moreover, the *per se* intentional discrimination approach advocated by Chambers simply eliminates the burden-shifting procedure described *supra* at 703, leaving the bfoq exception as the employer's only defense. Thus, our conclusion on the bfoq issue also would prevent Chambers from prevailing under her proposed *per se* intentional discrimination approach.

**19.** Further indication of the similarity of business necessity and bfoq is provided in *Dothard,* 433 U.S. at 321, 97 S.Ct. at 2720, where the Court referred to the "necessary to safe and efficient job performance" standard in relation to both of the defenses. *Compare Dothard,* 433 U.S. at 332 n. 14, 97 S.Ct. at 2728 n. 14 (business necessity) *with Dothard,* 433 U.S. at 333, 97 S.Ct. at 2728 (bfoq).

case," *Dothard*, 433 U.S. at 334, 97 S.Ct. at 2729, the role model rule is reasonably necessary to the Club's operations. Thus, we hold that the role model rule qualifies as a bona fide occupational qualification.

## III

Chambers also appeals the district court's dismissal of various other claims and parties. Specifically, she challenges the court's dismissal of the section 1983 claim against the Club for lack of state action, *Chambers v. Omaha Girls Club, Inc.*, No. CV 83–L–38, slip op. at 3–4 (D.Neb. October 19, 1983); dismissal of the NEOC on the ground of absolute immunity based on *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), *id.* at 4; dismissal of Governor Thone and Attorney General Douglas for failure to state a claim against them, *id.* at 4–6; grant of summary judgment in favor of the *Omaha World Herald* on the section 1985(3) and state conspiracy claims because of Chambers' failure to show conspiratorial agreement or other elements of the cause of action, *Chambers v. Omaha Girls Club, Inc.*, No. CV 83–L–38, slip op. at 3–6 (D.Neb. Nov. 7, 1985); dismissal of Ruth Chambers for failure to meet constitutional standing requirements, *Chambers v. Omaha Girls Club*, No. CV 83–L–38, slip op. at 3 (D.Neb. Jan. 13, 1986); dismissal of the constitutional claims for lack of state action, *Chambers v. Omaha Girls Club*, 629 F.Supp. 925, 931 n. 9 (D.Neb. 1986); grant of a directed verdict in favor of the Club on the section 1981 claim because Chambers failed to produce any evidence of intentional race discrimination, *id.* at 932–34; and grant of a directed verdict in favor of the Club on the section 1985(3) and state conspiracy claims because no evidence was presented to show that the Club was part of a conspiratorial agreement. *Id.* at 934–42. Our review of the record, the briefs, and the memorandum opinions of the district court satisfies us that Chambers' ar-

guments on these issues are without merit.[20]

## IV

In conclusion, we hold that the district court's finding that the Club's role model rule is justified by business necessity is not clearly erroneous, and we find further that the rule qualifies as a bona fide occupational qualification. Chambers' other allegations of error are without merit. Accordingly, the orders and judgment of the district court are affirmed.

McMILLIAN, Circuit Judge, dissenting.

I concur in Part III of the court's decision in this case, but I respectfully dissent from Part II of the opinion. I believe that Crystal Chambers alleged and proved discrimination based on race under a disparate impact theory and discrimination based on pregnancy under a disparate treatment theory in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. I would thus reverse the district court's judgment on the Title VII claims and remand for a determination of an appropriate remedy.

Today, the court, contrary to Title VII, upholds the Omaha Girls Club's (OGC) discharge of Chambers, a black, unmarried pregnant woman because of her pregnancy. Chambers, an arts and crafts instructor at OCG, was held to be a "negative role model" for the OGC members, who are girls and young women between the ages of eight and eighteen.

Title VII provides in part: "It shall be an unlawful employment practice for an employer ... to discharge ... or otherwise to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex...." 42 U.S.C. § 2000e–2(a).

The Equal Employment Opportunity Commission and many courts interpreted

**20.** Chambers' claim that the defendants' exercise of their peremptory challenges was unconstitutionally discriminatory is unavailing inasmuch as it was not raised below and no jury

verdict even exists to be challenged in this case. Chambers' argument that Judge Beam erred in refusing to recuse himself is also without merit.

this provision barring gender-based discrimination to prohibit discrimination based on pregnancy. C.F.R. § 1604.10(b) (1973); *Holthaus v. Compton & Sons, Inc.*, 514 F.2d 651, 653–54 (8th Cir.1975); *In re National Airlines, Inc.*, 434 F.Supp. 249 (D.C. Fla.1977) (the airline's policy of requiring flight attendants to cease working when they became pregnant violated Title VII). *Contra Harriss v. Pan American World Airlines, Inc.*, 437 F.Supp. 413 (D.C.Cal. 1977), *aff'd in part, reversed in part*, 649 F.2d 670 (9th Cir.1980). However, the Supreme Court in *General Electric v. Gilbert*, 429 U.S. 125, 145–47, 97 S.Ct. 401, 412–13, 50 L.Ed.2d 343 (1976), determined that an employer could exclude pregnant employees from receiving benefits under a disability plan. The Court reasoned that the exclusion was not gender-based but was condition-based. *Id.* at 136–37, 97 S.Ct. at 408.

In 1978, Congress responded to the Supreme Court's decision in *General Electric v. Gilbert* by amending Title VII to "prohibit sex discrimination on the basis of pregnancy." *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 670, 103 S.Ct. 2622, 2624, 77 L.Ed.2d 89 (1983) (*Newport News*). The new amendment, entitled the Pregnancy Discrimination Act, added a new subsection "k" to the definition section of Title VII; the new subsection reads in part as follows:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes ... as other persons not so affected but similar in their ability or inability to work....

42 U.S.C. § 2000e(k). This provision "made clear that, for all Title VII purposes, discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex." *Newport News*, 462 U.S. at 684, 103 S.Ct. at 2631; *see Carney v. Martin Luther Home, Inc.*, 824 F.2d 643, 647–48 (8th Cir.1987) (*Carney*).

An employer may justify discrimination otherwise prohibited by Title VII by showing either a business necessity or a bona fide occupational qualification (BFOQ) for the discriminatory policy or practice. *Carney*, 824 F.2d at 648. The business necessity exception applies to disparate impact cases involving facially neutral employment practices with a disproportionate impact on a protected group. The BFOQ exception applies to disparate treatment cases involving affirmative deliberate discrimination. *EEOC v. Rath Packing Co.*, 787 F.2d 318, 327 n. 10 (8th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 307, 93 L.Ed.2d 282 (1986). In *Gunther v. Iowa State Men's Reformatory*, 612 F.2d 1079, 1085 (8th Cir.), *cert. denied*, 446 U.S. 966, 100 S.Ct. 2942, 64 L.Ed.2d 825 (1980), this court noted that a BFOQ analysis is similar to and overlaps the business necessity test. Essentially, both exceptions require proof that a discriminatory job qualification or practice is both necessary to and effective in promoting the employer's business and that no less discriminatory alternatives exist.

The BFOQ and the business necessity exception are narrow exceptions which impose a heavy burden on the employer. *E.g., Dothard v. Rawlinson*, 433 U.S. 321, 334, 97 S.Ct. 2720, 2729, 53 L.Ed.2d 786 (1977). The employer must show that the problem to be addressed by the discriminatory act or practice is concrete and demonstrable, not just "perceived"; and the challenged act must be essential to eliminating the problem, not simply reasonable or designed to improve the problem. *EEOC v. Rath*, 787 F.2d at 332–33; *Jones v. Lee Way Motor Freight, Inc.*, 431 F.2d 245, 249 (10th Cir.1970), *cert. denied*, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971).

I agree with the majority that the district court's determination of business necessity or BFOQ in the present case is to be reviewed under the clearly erroneous standard. However, even under this very deferential standard, I would reject the BFOQ or business necessity exceptions offered by OGC because there is no evidence to support a relationship between teenage pregnancies and the employment of an unwed

pregnant instructor, and therefore I am left with the definite and firm conclusion that the district court made a mistake. *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

The district court, and now this court, accepts without any proof OGC's assumption that the presence of an unwed pregnant instructor is related to teenage pregnancies. *Chambers v. Omaha Girls Club,* 629 F.Supp. at 951 (D.Neb.1986) (*Chambers*). OGC failed to present surveys, school statistics or any other empirical data connecting the incidence of teenage pregnancy with the pregnancy of an adult instructor. OGC also failed to present evidence that other girls clubs or similar types of organizations employed such a rule. OGC instead relied on two or three highly questionable anecdotal incidents to support the rule.

The majority, while admitting to some uncertainty about whether the negative role model rule is subject to validation, places great weight on counsel's remarks during oral argument. Counsel's comments concerning the feasibility of such validation, however, are not a substitute for evidence demonstrating the validity or effectiveness of the role model rule. OGC had the burden of establishing a reasonable basis, that is a factual basis, for its belief, *Weeks v. Southern Bell Telephone & Telegraph Co.,* 408 F.2d 228, 235 (5th Cir. 1969), and in the absence of such proof, OGC may not implement the discriminatory rule.

Although there are no cases that have considered precisely the issue raised in this case,, a few courts have considered the role model defense in school settings and all have rejected the schools' role model defenses. In *Andrews v. Drew Municipal Separate School District,* 507 F.2d 611 (5th Cir. 1975), two unwed mothers challenged the school district's policy that prohibited the employment of teachers and teachers' aides who were unwed parents. Not unlike OGC, the school district defended the policy on the basis that such teachers would be poor role models for the children and that employing such teachers could lead to schoolgirl pregnancies. *Id.* at 613. The Fifth Circuit struck down the rule. *Id.* at 617.

> In the absence of overt, positive statements to which the children can relate, we are convinced that the likelihood of inferred learning that unwed parenthood is necessarily good or praiseworthy, is highly improbable, if not speculative. We are not at all persuaded by defendants' suggestions, quite implausible in our view, that students are apt to seek out knowledge of the personal and private life-styles of teachers or other adults within the school system (i.e. whether they are divorced, separated, happily married or single, etc.), and, when known, will approve and seek to emulate them.

*Id., citing Andrews v. Drew Municipal Separate School District,* 371 F.Supp. 27, 35 (N.D.Miss.1973).

Six years later, the Fifth Circuit had a chance to again consider the role model defense in *Avery v. Homewood Board of Education,* 674 F.2d 337 (5th Cir.1982). The school district justified its firing of an unwed pregnant teacher on the basis that she was a negative role model and her pregnancy would provoke teenage pregnancies. *Id.* at 339. Citing *Andrews v. Drew Municipal Separate School District,* 507 F.2d at 614, the Fifth Circuit, once again, rejected the role model defense.

> [W]e rejected all three rationales offered in support of ... the rule ... (1) that unwed parenthood is prima facie proof of immorality; (2) that unwed parents are unfit role models, and (3) that employment of an unwed parent in a scholastic environment materially contributes to the problem of school-girl pregnancies.

674 F.2d at 341.

In *Ponton v. Newport News School Board,* 632 F.Supp. 1056 (E.D.Va.1986) (*Ponton*), the district court also carefully considered the same issue. In *Ponton,* a pregnant unmarried teacher of vocational home economics at a magnet school in Newport, Virginia, was forced to take a leave of absence because the school district

**708**

alleged that it had an interest in "protecting schoolchildren from exposure to a single, pregnant teacher." *Id.* at 1062. The district court, noting that it had "serious doubt as to whether this is in fact a legitimate interest," concluded that the effect on students of the "mere sight of a single, pregnant teacher would be negligible, at best." *Id.* The court further commented that

> [e]ven if plaintiff's students would have known that she was single, the mere knowledge that their teacher had gotten pregnant out of wedlock would seem to have a fairly minimal impact on them. There was no evidence that plaintiff intended to proselytize her students regarding the issue of unwed pregnancy.

*Id.* at 1063. The district court in *Ponton* also determined that plaintiff's pregnancy had not affected her ability to implement the prescribed curriculum in her classes nor could her pregnancy be perceived as representing a "School Board-sponsored statement regarding the desirability of pregnancy out of wedlock; rather, such status could only be viewed as representing a personal decision made by plaintiff in her private capacity." *Id.* Although the plaintiff in *Ponton* alleged a constitutional right of privacy claim and the district court decided the case on this basis, the rationale is applicable to the present case because the employers in both cases contend that the policy prohibiting single pregnancies is necessary to the effectuation of its programs.

The district court in the present case, although correctly articulating the BFOQ and business necessity tests, failed to actually apply the tests. *Chambers,* slip op. at 951. Instead of requiring OGC to demonstrate a reasonable relationship between teenage pregnancy and the employment of single pregnant women, the district court accepted the beliefs and assumptions of OGC board members. *Id.* at 951. The district court stated that "the Girls Club established that it honestly believed that to permit single pregnant staff members to work with the girls would convey the impression that the Girls Club condoned pregnancy for the girls in the age group it serves." *Id.* at 950. Based on this belief

alone, the district court stated that "the court is satisfied that [OGC has] met the burden of showing that a manifest relationship exists between the Girls Club's fundamental purpose and its single pregnancy policy." *Id.* at 950. The district court, in discussing the BFOQ defense, further stated: "Here we have a rule made in an attempt to limit teenage pregnancy, and no data to support a finding that the rule either does, or does not, accomplish this purpose." *Id.* at 951. Despite this explicit recognition by the district court that there was no data to support a relationship between teenage pregnancy and the negative role model rule, the district court, nonetheless, stated: "This court believes that the policy is a legitimate attempt by a private service organization to attack a significant problem within our society." *Id.* at 951.

Neither an employer's sincere belief, without more, (nor a district court's belief), that a discriminatory employment practice is related and necessary to the accomplishments of the employer's goals is sufficient to establish a BFOQ or business necessity defense. The fact that the goals are laudable and the beliefs sincerely held does not substitute for data which demonstrate a relationship between the discriminatory practice and the goals. The district court, recognizing that there was no data to support such a relationship, should have held that OGC failed to carry its burden of showing a BFOQ or business necessity.

Even if I were to accept for purposes of argument that OGC established a relationship between the single pregnancy policy and the work of the club, the BFOQ and the business necessity exceptions must still fail because OGC did not establish that there were no less discriminatory alternatives available. Unlike the district court and the panel majority, I am unimpressed by OGC's rejection of alternatives with less discriminatory impact. OCG's personnel policy provided leave of absences for up to six weeks for pregnancies and other sicknesses and longer leaves upon approval of the board. It is clear that OGC could have accommodated its stated mission and the

pregnancy of Crystal Chambers by granting her a leave of absence or by placing her in a noncontact position. Administrative inconvenience is not a sufficient justification for not utilizing these less discriminatory alternatives.

In summary, OCG failed to carry the heavy burden of showing a nexus between its negative role model rule and teenage pregnancies and that implementation of the rule is essential to eliminating the problem, and thus failed to demonstrate that the single pregnancy policy was justified by either business necessity or was a BFOQ. Thus, I would reverse the judgment of the district court on the Title VII claims and remand this case with instructions to the district court to enter judgment in favor of Chambers on the Title VII claims and to grant appropriate relief.