In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 21-2665

JENNIFER R. LAM-QUANG-VINH,

*Plaintiff-Appellant*,

*v.*

SPRINGS WINDOW FASHIONS, LLC,

*Defendant-Appellee*.

———————————

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 20-cv-384-bbc — **Barbara B. Crabb**, *Judge*.

———————————

ARGUED APRIL 27, 2022 — DECIDED JUNE 16, 2022

———————————

Before SYKES, *Chief Judge*, and BRENNAN and SCUDDER, *Circuit Judges*.

PER CURIAM. Jennifer Lam sued her former employer, Springs Window Fashions, LLC, for retaliating against her in violation of the False Claims Act's whistleblower protection provision. *See* 31 U.S.C. § 3730(h).[1] She alleged that Springs harassed her and then fired her after she told management

———————————

[1] The plaintiff refers to herself as Lam, so we do as well.

that the company owed higher tariffs. The district court granted summary judgment to Springs, concluding that Lam failed to present sufficient evidence of retaliation. We affirm because Springs's conduct falls short of "harassment" under § 3730(h)(1), and Lam has not established a connection between the tariff violations she reported and Springs's decision to fire her.

**I**

Springs is a Wisconsin-based manufacturer and distributor of window coverings. Jennifer Lam began working at Springs as its senior manager of global trade in January 2019. During her time at the company, Lam encountered two significant problems—one relating to inventory and the other to tariffs.

Lam learned about the inventory problem in March 2019: three of Springs's manufacturing facilities in Mexico were inaccurately tracking import and export inventories because two computer systems were not properly integrated. The company's then-Chief Financial Officer, Chris Nagel, told Lam to create a plan to fix the inventory discrepancy. Nagel left Springs, and, for the next four months, Lam reported directly to Springs's Chief Executive Officer, Eric Jungbluth. Lam told Jungbluth that she aimed to resolve this first problem by June 2020.

During this four-month stretch, Lam discovered the tariff problem. She believed that a product Springs imported—cellular fabric blankets used to make window shades—originated in China and not, as the supplier had insisted, in Taiwan and Malaysia. This detail mattered because fabrics originating in China were subject to a steep 25 percent tariff.

Jungbluth had experience with these tariffs. Lam's predecessor, Jennifer Sharkey, told Springs's management in 2018 that the blankets originated in China—an opinion shared by outside counsel. At first, Sharkey had told Jungbluth that new country-of-origin regulations would not negatively impact the company. But months later, Sharkey realized she had made an error; the regulations would harm Springs financially. Jungbluth then directed Nagel to issue Sharkey a letter of reprimand. The following month, Sharkey resigned, finding her job too stressful because of Jungbluth's animosity toward her.

According to Lam, her stance on the tariffs was also poorly received. She told Jungbluth, in at least three meetings between June and September 2019, that the company would need to pay higher tariffs on the fabrics. He became "frustrated and visibly irritated" when she would not reconsider her conclusion. And because Lam refused to acquiesce to his view, she was "scolded" by Springs's Vice President of Procurement and then-Vice President of Finance in a private meeting in September. Days later, when she reiterated her opinion in a senior leadership meeting, Jungbluth "angrily berated" her and maintained that the company would not pay the tariffs. In late October, the General Counsel told Lam that he had made a "business decision" to classify the imported fabrics as Taiwanese and Malaysian rather than as Chinese. Lam accepted the decision and had no further conversations with anyone at Springs about the tariffs.[2]

---

[2] The record does not reveal whether the goods should have been classified as Chinese or whether Springs later changed the classification.

Meanwhile, Lam had started reporting to the company's new Chief Financial Officer, Tim Oliver, in late September 2019. Oliver knew about Lam's disagreement with Jungbluth; two days before the General Counsel's decision, Oliver even told Lam to continue classifying the fabrics as Taiwanese and Malaysian. But Oliver wanted Lam to focus on the inventory problem to avoid fines from the Mexican government. Based on the timeline Lam had previously provided, Oliver believed that the problem could be fixed in 9 to 12 months. Then, after Lam proposed a five-year plan for a separate project at a November meeting, Oliver responded that she would "not be here in five years." Lam says she did not know what Oliver meant and she did not ask him.

In December 2019, executives at Springs were directed to review their staff and to determine if anyone should be placed on a performance improvement plan. Although Oliver had not told Lam he was dissatisfied with her work, he put her on such an improvement plan. Oliver identified four areas in which Lam was not meeting expectations: (1) her failure to adequately address the inventory problem, causing the problem to "grow"; (2) her failure to supplement tariff concerns with a "risk assessment," a "solution," or a "process change," while still "assuring appropriate compliance"; (3) her reliance on outside consultants; and (4) her inability to communicate concisely. The improvement plan stated that if Lam did not meet expectations after 30, 60, and 90 days, she would be fired. Lam was also required to submit a "clear plan" to address the inventory problem by January 6, 2020.

That day, Lam submitted to Oliver the requested plan to address the inventory problem. But Oliver was dissatisfied because Lam's submission lacked a calendar and budget. Lam

later supplemented her submission with more information, such as the cost of retaining an outside consultant, but she did not reference a calendar or budget. Oliver then asked Lam for a more detailed plan that included an end date. She told him, however, that an end date for such a large project was unrealistic.

In early February 2020, after discovering the inventory discrepancy, the Mexican government audited one of Springs's facilities. Lam did not tell Oliver about the audit for two days—a delay that frustrated Oliver. According to Lam, she waited to tell him because she was sick and drowsy from medication on February 5, and she instead told her subordinate that day to tell Oliver about the audit.

On February 17, Oliver fired Lam. Oliver later testified that he could not rely on her to fix the inventory problem—an especially high-priority issue after the audit—given that she still had no plan in place, and that she lacked planning skills, was unfocused, and had a poor communication style. Oliver also attested that Lam's concerns over the tariffs had nothing to do with his decision to fire her and that Jungbluth did not direct him to fire her.

## II

Lam sued Springs in April 2020. She alleged that Springs retaliated against her, in violation of the False Claims Act, over her opinion that the company owed the 25 percent tariff on the fabric blankets. *See* 31 U.S.C. § 3730(h). In her view, Springs retaliated against her in two ways: first, by senior executives berating and scolding her over her stance on the tariffs; and second, by firing her because of that stance. In support of her claim that Springs fired her over the tariffs, she

pointed to Jungbluth's punishment of Sharkey after Sharkey expressed that Springs owed the tariffs; Oliver's statement that Lam would not be at Springs in five years; the timing of the measures Springs took against her; and Springs's supposed lack of a legitimate reason for firing her.

The district court granted Springs's motion for summary judgment. The court first ruled that company executives did not retaliate against Lam by reacting angrily to her tariff analysis. Lam had not identified any specific comments made to her by the executives. And, the court reasoned, isolated incidents of mere frustration cannot support a retaliation claim.

The court also concluded that Lam had not shown she was fired for raising the tariff issue to management. The evidence surrounding Sharkey was unhelpful, the court reasoned, because Sharkey had a different supervisor, was not fired, and was not placed on a performance plan. The court also explained that Oliver's statement was vague, lacking in context, and thus not suggestive of retaliatory intent. Nor was there anything suspicious about the timing of the performance improvement plan or Lam's firing, the court concluded, because all executives were asked to determine which staff needed to improve performance, and at that time, Lam had made little progress in fixing the inventory problem. Finally, the court rejected Lam's argument about pretext because Lam presented no evidence that Oliver's stated reasons for placing her on a performance improvement plan or firing her were insincere.

### III

Lam now appeals. We review the court's grant of summary judgment de novo, construing all facts in the light most

favorable to Lam and drawing all reasonable inferences in her favor. *See Anderson v. Nations Lending Corp.*, 27 F.4th 1300, 1304 (7th Cir. 2022). We need not draw every conceivable inference in her favor, and inferences supported only by speculation or conjecture cannot defeat summary judgment. *See Bishop v. Air Line Pilots Ass'n Int'l*, 5 F.4th 684, 693 (7th Cir. 2021).

The governing law in this case is the False Claims Act, 31 U.S.C. §§ 3729–3732, which makes it unlawful for any person to defraud the United States Government by making false claims. Its whistleblower provision protects an employee who warns her employer that the employer is making false claims:

> Any employee … shall be entitled to all relief necessary to make that employee … whole, if that employee … is *discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment* because of lawful acts done by the employee … in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

*Id.* § 3730(h)(1) (emphasis added); *Halasa v. ITT Educ. Servs., Inc.*, 690 F.3d 844, 847–48 (7th Cir. 2012). To defeat Springs's motion for summary judgment, Lam had to show that her actions were taken "in furtherance of" the statute, that Springs knew she was engaged in this protected conduct, and that Springs retaliated against her at least partially because of the protected conduct. *See Fanslow v. Chicago Mfg. Ctr., Inc.*, 384 F.3d 469, 479 (7th Cir. 2004). Springs concedes the first two requirements but maintains that it did not retaliate against Lam.

On appeal, Lam contends that Springs violated the False Claims Act, both through the comments its executives made after she informed them that Springs owed additional tariffs, as well as by firing her because of that stance.

**A**

We begin with Lam's claim that Springs's executives retaliated against her within the meaning of § 3730(h)(1) by "harass[ing]" her over her position on the tariffs. She says that harassment resulted from a combination of events: Jungbluth was "frustrated and visibly irritated" with her stance on the tariffs, he "angrily berated her" at a company meeting over that stance, and two other executives "scolded" her for disagreeing with Jungbluth.

We have not defined what constitutes "harassment" under the False Claims Act. Both parties ask us to borrow from Title VII. Invoking the test used to interpret Title VII's retaliation provision, 42 U.S.C. § 2000e–3(a) (employers shall not "discriminate against" any employee because she has opposed an unlawful employment practice), Lam asks us to consider whether the conduct here would have dissuaded a reasonable worker from complaining to management about its obligation to pay the tariffs. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).

Springs asks us to adopt the more stringent test used for Title VII's substantive discrimination provision. *See* 42 U.S.C. § 2000e–2(a) (employers shall not "refuse to hire … discharge … or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment," because of the individual's protected characteristics). Under that test, Lam would have to show that the

retaliatory acts were severe or pervasive enough to affect the terms and conditions of her employment, much like a plaintiff bringing a hostile-work-environment claim. *See Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013). In Springs's view, § 3730(h)(1) requires such a showing because it protects employees who are "in any other manner discriminated against in the terms and conditions of employment."

Only two federal courts of appeals have addressed what "harassment" means under § 3730(h)(1). Both adopted the test Lam proposes. The Ninth Circuit held without explanation that the test used for Title VII's retaliation provision should apply to the False Claims Act's retaliation provision. *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab'y*, 275 F.3d 838, 847–48 (9th Cir. 2002). The Fifth Circuit observed that it applies the test for Title VII's retaliation provision to retaliation provisions in other statutes. And because those statutes are worded similarly to § 3730(h)(1), it reasoned that the same test should apply to the False Claims Act. *U.S. ex rel. Bias v. Tangipahoa Par. Sch. Bd.*, 816 F.3d 315, 326 (5th Cir. 2016).

We need not decide which standard applies, though, because Lam was not harassed according to either one. Even employing the more lenient test, under which Lam does not need to show a change to the terms and conditions of her employment, her generic descriptions of hostility are insufficient. Lam stated only that Jungbluth appeared "frustrated and visibly irritated," that he "berated" her, and that two other executives "scolded" her. The Supreme Court has clarified that a "simple lack of good manners" would not deter a reasonable worker from reporting. *Burlington Northern*, 548 U.S. at 68. And, applying Title VII's retaliation provision, we have concluded that summary descriptions of yelling and

unspecified intimidation would not dissuade a reasonable employee from reporting. *See Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009) (yelling); *Henry v. Milwaukee Cty.*, 539 F.3d 573, 587 (7th Cir. 2008) (intimidation).

Without any facts describing the words used by Springs's executives, or the context of their statements, a reasonable jury could not conclude that Lam was "harassed" within the meaning of the False Claims Act.

**B**

We turn next to Lam's claim that Springs fired her in retaliation for her stance that the company owed higher tariffs. As she did in the district court, she points to the following as evidence of retaliation: (1) Jungbluth's directive that Nagel punish Sharkey when Sharkey took the same position; (2) Oliver's comment that Lam would not be at Springs in five years; (3) the timing of the performance improvement plan and her firing; and (4) Springs's purported lack of a legitimate reason to fire her. Viewed individually or together, this evidence is insufficient to show that Springs fired Lam because she informed the company of its obligation to pay higher tariffs.

*1. Jungbluth's involvement*

Lam first suggests that Jungbluth was involved in the decision to fire her. Because she clashed with him over the tariffs, Lam believes, a jury could find that she was fired because of her stance on the tariffs. She points out that when Sharkey expressed the same opinion, Jungbluth reached down the chain of command to punish Sharkey. Lam also argues that Oliver's knowledge of Jungbluth's disagreement with her

over the tariffs could have influenced Oliver's decision to fire her.

To start, a jury could not infer from Jungbluth's treatment of Sharkey that Jungbluth encouraged Oliver to fire Lam in retaliation for her stance on the tariffs. A different employment decision, concerning a different employee, made by a different supervisor, is not strong evidence of discrimination. *See Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012). Sharkey had a different direct supervisor, was not placed on a performance improvement plan, was not fired, and admitted to making an error before her letter of reprimand.

Nor is there any evidence that Oliver's knowledge of the disagreement between Jungbluth and Lam over the tariffs influenced Oliver's decision. Jungbluth and Lam last spoke about the tariffs five months before Oliver fired her. Lam accepted the company's decision not to classify the goods as Chinese three and a half months before she was fired. And Oliver was unhappy with Lam over the unrelated inventory matter.

### 2. Oliver's comment

Lam next argues that a jury could infer retaliation from Oliver's November 2019 comment that she would "not be [at Springs] in five years." In her view, this comment suggests that Oliver had decided by that time to fire her—three weeks before he placed her on a performance improvement plan. But without more context, a reasonable jury could not connect this vague statement to any retaliation based on her stance on the tariffs two months earlier. Oliver's comment could just as easily have related to her performance on the inventory problem, or his misgivings about her communication style. In fact, Lam

concedes that she did not know what Oliver meant by this comment, and her attorney did not press Oliver further on this point in his deposition. And inferences supported only by speculation or conjecture cannot defeat summary judgment. *Bishop*, 5 F.4th at 693.

### 3. Timing

Lam also argues that timing of the performance improvement plan (December 2019) and her discharge (February 2020) was suspicious. But suspicious timing alone is "rarely sufficient to overcome a motion for summary judgment." *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 221 (7th Cir. 2015). And the timing here was not all that suspect. Oliver put Lam on a performance improvement plan only after every leader was asked to review staff, and at a juncture when Lam had made little progress on the inventory problem with only six and a half months left until her projected resolution date. By that time, three months had passed since Lam last clashed with any executive over the tariffs and six weeks had passed since Lam told the General Counsel that she accepted the company's decision on the tariffs. Oliver ultimately decided to fire Lam two months later, when her plan still lacked the calendar and budget he had requested.

### 4. Pretext

Last, Lam argues that a reasonable jury could find that Oliver's proffered reasons for firing her must have been pretextual because the reasons are not supported by a "shred of evidence." She maintains that nobody expected her to resolve the inventory problem in time to prevent an audit in February 2020, that her illness was a legitimate reason to delay telling Oliver about the audit, and that there is no record of her

supposed poor communication style. She also points to the language of the performance improvement plan. In her view, a jury could infer that Oliver was upset over her prior tariff stance because the plan criticized the way she raised tariff concerns and directed her to include "risk assessment[s]" and "solution[s]" when relaying those concerns to management.

But none of this shows Oliver's reasons were pretextual. Lam had to present evidence suggesting that Oliver did not honestly believe his stated reasons for firing her. *See Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020). The question is not whether his reasons were inaccurate or unfair, but whether they are too implausible for a jury to believe. *See Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 724 (7th Cir. 2018). Oliver testified that he fired Lam because she had not produced any sort of detailed plan to fix the inventory problem after repeated requests and because he believed her communication, planning, and focus was lacking. Yet, Lam does not explain why her plan was adequate. Nor does she offer other evidence suggesting that Oliver could not have believed those reasons. The impossibility of fully resolving the inventory problem by February 2020 and her delay in telling Oliver about the audit are not relevant because Oliver never suggested that he fired her for either of those reasons.

Nor could a reasonable jury infer retaliatory intent from the improvement plan's language. To be sure, the plan states that Oliver was unhappy with the way Lam communicated her tariff concerns. A reasonable jury could infer that Oliver did not want Lam to tell management only that the company might owe increased tariffs; he also wanted her to calculate the risk of not paying the tariffs and to propose changes the company could make to avoid the tariffs. But nothing in the

plan suggests that Oliver fired Lam because she told the company it was violating trade law. He took issue only with her failure to accompany her concern with greater context and a solution.

Lam makes two final arguments that require only brief discussion. She first asserts that the district judge failed to view the facts in the light most favorable to her. For example, she faults the judge for concluding that she "felt berated" by Springs executives when she had stated that she in fact "was scolded." These distinctions are immaterial. As we have explained, even if Lam were in fact scolded or berated, those generic descriptions would not amount to harassment.

For the first time, Lam also argues that a jury could infer that the performance improvement plan was a sham because Springs did not conduct the 30-day and 60-day assessments that the plan contemplated. But by not raising the argument first in the district court, Lam waived it. *See Mahran v. Advocate Christ Med. Ctr.*, 12 F.4th 708, 713 (7th Cir. 2021).

For all these reasons, we AFFIRM the district court's grant of summary judgment to Springs Window Fashions.